## State of North Dakota vs. Myron R. Kent.

Opinion filed June 5th, 1896.

### When Trial Begins—Change of Venue.

Under section 7312, Comp. Laws, providing for a change of place of trial in certain criminal cases, a trial does not begin until the jury is impaneled; and a change of venue granted before that time is granted "before the trial is begun."

### Consent of Accused to be Tried on Change of Venue in Distant County.

Where an accused charged with the crime of murder has established his right to a change of place of trial to the satisfaction of the court, he may, in open court, consent that the case be sent for trial to the District Court of some county that is not "near or adjoining ' the county of original venue; and, after trial in the court to which the case is so sent by his request, he cannot be heard to object to the jurisdiction of such court.

### Motion to Set Aside Information.

A motion to set aside an information cannot be made after a plea of not guilty and one trial upon that plea. Neither can the point be raised by motion in arrest. Under our statutes, a motion in arrest only reaches defects that are available on demurrer.

### Correcting Erroneous Ruling Upon Challenge by the State.

While a jury was being impaneled, the state had exercised five of the six peremptory challenges allowed by law. The state challenged a proposed juror for cause. The examination of the juror disclosed that he was generally disqualified. The court, however, denied the challenge, and thereupon the state challenged the juror peremptorily. Immediately thereafter the court sustained the challenge for cause, and the juror stepped aside. Subsequently the court permitted the state to exercise another peremptory challenge. *Held* no error.

### Names of Witnesses Indorsed Upon Information—Waiver of Requirement.

It is the duty of the state's attorney to indorse upon an information, at the time of filing the same, the names of all witnesses for the state known to him at that time; and ordinarily no witnesses should be permitted to testify for the state whose names are not so indorsed, unless it is clearly made to appear that such witnesses were not known to the state's attorney at the time of filing the information; but upon a second trial upon the same information this rule will not apply to witnesses for the state who testified upon the first trial, without objection on the part of the accused.

### Preliminary Questions.

It is not error to permit preliminary questions to be answered when such answers lead up to or connect what follows either in the testimony of the witness under examination or any other witness who testifies in the case, even though the relevancy of such questions may not be apparent when asked.

## Corroboration of Accomplice.

An accomplice, as a witness, cannot by any means corroborate himself, within the meaning of the statute which requires the testimony of an accomplice to be corroborated in order to warrant conviction; but the state has the right to introduce, through the accomplice, all matters of probative force in the case to which he can testify, whether written or otherwise, in order to make his testimony as strong and inherently probable as the facts will warrant.

## Flight of Accused—Competent to Prove.

The flight and secretion of the accused may. always be shown; and, to this end, it is entirely proper to prove by the officers of the law what steps were taken by them to locate and arrest the accused.

## Cross Examination of Accused.

While it is true in this jurisdiction that the cross-examination of a witness (except as to matters affecting credibility) must be confined to the subjects to which the direct examination was addressed, yet this does not limit cross-examination to the particular facts to which the witness testified on direct examination. A subject, having been once opened, may be exhausted.

## Credibility of Witness—Degrading Questions.

For the purpose of affecting the credibility of a witness, it is proper to ask him on cross-examination questions the answers to which may tend to degrade, disgrace, or criminate him; but this is subject to his constitutional privilege to refuse to answer any question the answer to which will tend to criminate him.

## 'Defendant as Witness—Cross-Examination.

A defendant in a criminal case who takes the witness stand in his own behalf is subject to the same rules of cross-examination that govern other witnesses; and he is required to answer any relevant and proper question on cross-examination that will tend to convict him of the crime for which he is being tried, even though such answer may also tend to convict him of some collateral crime.

## Proof of Collateral Crimes to Show Motive.

It is proper, in a criminal case, to prove the commission by the accused of another and collateral crime, where such crime furnishes a motive for the commission of the crime for which the accused is being tried; and where the accused, as a witness for himself, has denied the existence of the motive which the evidence of the state tended to show prompted the commission of the crime for which he is being tried, it is proper to show by him, on cross-examination, the commission of the collateral crime that furnishes such motive.

## Remoteness of Collateral Offense.

For the purpose of showing motive, the remoteness in point of time of the commission of the collateral crime cannot be considered; the sole question being whether it furnished an active, existing motive for the commission of the crime for which the party is on trial.

### Defendant's Privilege When Not Waived by Becoming a Witness.

A defendant in a criminal case, who becomes a witness in his own behalf, while he thereby waives his constitutional privilege of not answering proper questions that may tend to convict him of the crime for which he is on trial, does not thereby waive his privilege to decline to answer questions the answers to which may tend to convict him of collateral crimes, when such questions are asked solely to affect his credibility.

### Privilege Personal—How Claimed.

A witness who desires to claim his constitutional privilege of declining to answer a question, on the ground that the answer will tend to criminate him, must make his claim in person, and under the sanctity of his oath, and with sufficient definiteness to render his claim clear to the court; otherwise, he cannot complain if his privilege is denied.

### Attorney Cannot Claim Privilege.

Even when the witness is also the party defendant, he cannot claim his privilege through his attorney; but it is highly proper in such a case that the attorney suggest to the court that the witness be apprised of his constitutional rights.

### Cross-Examination—Specific Acts of Misconduct.

When it is sought to impair the credibility of a witness on cross-examination by showing bad moral character, the interrogarories should be confined to specific facts, and should be so framed that the witness can squarely admit or deny. Insinuating questions, from which a possible inference of guilt as to collateral crimes might arise, are not proper.

### Evidence of Collateral Crimes—Of Ancient Date.

Nor does it impair the credibilty of a witness to show the commission of a collateral crime more than twenty years before the examination. There has been ample time to repent and atone. The offense may have been forgiven and forgotten, and public interest demand that it be left buried in its seclusion.

### Consideration Limited to-Purpose of Evidence.

Where evidence is properly admitted in the case for one purpose, it will not be presumed, in the absence of all showing, that it was considered for a purpose for which it was not proper; particularly when the court, in its charge, directs the jury to consider it only for the proper purpose.

### Remarks of Counsel.

The remarks of counsel in addressing the jury are largely within the discretion of the trial court, and no error will be declared thereon except in case of a clear abuse of discretion. Counsel should not be fetted in arguing his case to the jury. Objectionable remarks in this case, with the rulings and instructions of the court thereon, considered, and *held* not error.

### Instructions.

Instructions of the court in this case examined, and *held* not vulnerable to the general objections that they "invaded the province of the jury," or were "argumentative," or "assumed that certain facts were proven" or were "prejudicial to the accused."

### Refusal of Requests Covered by General Charge.

Plaintiff in error requested that a large number of instructions be given to the jury, some of them correctly stating the law applicable to the case, and others not. They were all refused, but the court, in its charge, had fully, fairly, and correctly covered every point upon which instructions were requested. *Held*, no error in refusing the instructions requested.

### Caution of Jury Not to Consider Passages Between Court and Counsel.

It is the duty of the court to properly control and restrain counsel in the matter of cross-examining witnesses. In doing so in this case, there were passages between court and counsel indicative of some feeling and ill temper. If there was anything connected with this matter prejudicial to the accused, it was fully cured by an instruction which called the attention of the jury to the specific matters, and directed them not to permit such matters to prejudice them against the accused in any manner.

### Separation of Jury—Improper Influences—Burden of Proof.

Where, after the jury had been sworn and placed in charge of bailiffs, and before the case was fully submitted to them, the jurors separate without the consent of the court, under circumstances which give an opportunity for the exercise of improper influences over the jurors, prejudice to the accused will be presumed; and, when such separations are brought to the attention of the court by affidavit on motion for new trial, the burden is on the state to overcome such presumption of prejudice. But when the counter affidavits of the state fully meet every point raised in the affidavits for the motion, and show clearly that no improper influences were used or attempted, such separations furnish no ground for new trial.

### Jurors Attending Church—Presumption that Discourse Produced No Impression Upon Jurors.

While the jury was so in charge of the bailiffs, and before the case was finally submitted to them, by order of the court, and with the consent of counsel on both sides, the jurors were permitted to attend church on a certain Sabbath; and a portion of them, in charge of a bailiff, did attend church. A new trial was asked upon the ground of improper influence exerted over them by reason of the nature of the sermon to which they listened; but *held*, that no prejudice could be presumed; and *held*, further, that as it is conceded that the discourse was not delivered with any intention or thought of influencing the jury, and was a proper and ordinary emanation from a Christian pulpit, even if its tendency was prejudicial to the accused he cannot be heard to complain thereof, after consenting that the jurors might attend church.

### Evidence Sufficient to Sustain Verdict.

Evidence examined, and *held* amply sufficient to sustain the verdict.

Error to District Court, Cass County; *McConnell*, J.

William W. Pancoast, informed against as Myron R. Kent, was convicted of murder, and brings error.

Affirmed.

*M. A. Hildreth, Jas. E. Campbell,* and *W. H. Barnett,* (*C. F. Amidon,* of counsel,) for plaintiff in error.

The change of venue from the Sixth Judicial District to the Third Judicial District, after the trial had begun, was without authority of law. Section 7312, Comp. Laws. The court was without jurisdiction, and defendant could not confer jurisdiction by consent. *Bronillett* v. *Judge,* 12 Rep. 134; *State* v. *Bulling,* 12 S. W. Rep. 356; *Hudley* v. *State,* 36 Ark. 237; *Duncan* v. *State,* 84 Ind. 204; *Keith* v. *State,* 90 Ind. 89; *App.* v. *State,* 90 Ind. 73; 9 Am. and Eng. Enc. L. 650; 10 Am. and Eng. Enc. L. 630. Constitutional rights cannot be waived. 6 Cr. L. Mag. 182; *Peo.* v. *Murray,* 5 Cr. L. Mag. 227. *State* v. *Carman,* 5 Cr. L. Mag. 560; *Peo.* v. *Lyons,* 5 Cr. L. Mag. 678. The verification to the information is void, it being on belief only. Chapter 71, Laws 1890; *State* v. *Hazledahl,* 2 N. D. 521; 16 L. R. A. 153. The law does not permit the state to call witnesses to testify whose names are not indorsed upon the information, unless they were unknown to the states attorney as witnesses when the information was filed. Chapter 71, Laws 1890; *Peo.* v. *Hall,* 12 N. W. Rep. 665; *Parks* v. *State,* 31 N. W. Rep. 5; *Peo.* v. *Quick,* 25 N. W. Rep. 302; *Logan* v. *United States,* 144 U. S. 263-310; 36 L. Ed. 439; 12 S. C. R. 617; *Peo.* v. *Dietz,* 49 N. W. Rep. 296; *U. S.* v. *Stewart,* 2 Dallas, 342; 1 L. Ed. 408; *State* v. *Stevens,* 47 N. W. Rep. 546; *Stevens* v. *State,* 28 N. W. Rep. 304; *Gandy* v. *State,* 40 N. W. Rep. 302; *State* v. *Hamilton,* 13 Nev. 386; *Peo.* v. *Howes,* 45 N. W. Rep. 961. The states attorney should make showing that he was not aware of the mistake until that time. *Binkley* v. *State,* 52 N. W. Rep. 708. An accomplice cannot corroborate himself by his own acts or declarations made after the homicide. *Peo.* v. *Bleecker,* 2 Wheelers Cr. Cases, 255; *Peo.* v. *Stanley,* 47 Cal. 113; *Peo.* v. *Moore,* 45 Cal. 19; *Peo.* v. *Pavlik,* 3 N. Y. Supp. 232; *Com.* v. *Crowninshield,* 10 Pick. 497. The testimony of Bingenheimer as to what he did in his endeavors to find defendant was improperly admitted and prejudice is presumed. *Queen* v. *Gibson,* 7 Am. Cr. Repts. 171; *Somerville* v. *State,* 6 Tex. App.

433; *State* v. *Melrose*, 12 S. W. Rep. 250; *Peo.* v. *Pavlik*, 3 N. Y. Supp. 232; *Peo.* v. *Sharp*, 19 N. W. Rep. 168; *Lewis* v. *Com.*, 11 S. W. Rep. 27. It cannot be contended that the receiving of incompetent testimony was not injurious to the accused. No one can tell whether the jury were guided by that which was proper or improper. *State* v. *Rothschild*, 3 Am. Cr. Repts. 326; *McMillen* v. *Aitchison*, 3 N. D. 183; *Coleman* v. *Peo.*, 2 Cowens Cr. Repts. 19. The error must be shown conclusively to be innocuous else it will reverse the conviction. *Vandevoort* v. *Gould*, 36 N. Y. 639; *Peo.* v. *Haines*, 1 Cow. Cr. Repts. 71; *Peo.* v. *White*, 14 Wend. 112. The cross-examination of defendant as to other crimes, at a remote time was improper. Unless the independent offense is directly connected with the principal offense it cannot be proven as showing motive. *State* v. *LaPage*, 2 Am. Cr. Rep. 506, 57 N. H. 245, cited with approval in *State* v. *Fallon*, 2 N. D. 514; *Shaffner* v. *Com.*, 72 Pa. St. 60, 13 Am. Repts. 649. The limit to evidence of this character is that it must be sufficiently near in point of time to have a tendency to lead the guarded discretion of a reasonable and just man to a belief in the existence of this important element in the fact to be proved. *Thayer* v. *Thayer*, 101 Mass. 111, 113; *Com.* v. *Abbott*, 130 Mass. 473; *Billings* v. *State*, 12 S. W. Rep. 574. The cross-examination of defendant should have been limited to matters pertinent to the issue, or such matters as could have been proven by other witnesses. *Peo.* v. *Brown*, 72 N. Y. 571; *State* v. *Lawrence*, 57 Me. 581; *Peo.* v. *Crapo*, 76 N. Y. 291; *Clarke* v. *State*, 78 Ala. 474; 6 Am. Cr. Rep. 525; *Elliott* v. *State*, 51 N. W. Rep. 315; Thomp. on Trials, 652, 653. The point of objection to this line of cross-examination in *Territory* v. *O'Hare*, 1 N. D. 30, (44 N. W. Rep. 1003,) was that "the state cannot inquire into defendants history or attack his character unless the defendant has first put his character in issue." This was the ground upon which the objection was rested in the case of *Brandon* v. *People*, 42 N. Y. 268, and the latter case was distinguished in *Peo.* v. *Brown*, 72 N. Y. 571. The defendant was privileged from answering as to collat-

eral crimes. Whart. Cr. Ev. § 432; *State* v. *White*, 27 Am. Repts. 142 and note. The cross-examination as to remote criminal acts was incompetent for impeaching defendants credibility, as a witness. The inquiry should have been confined to transactions comparatively recent, bearing directly upon the present character of the witness. Greenleaf Ev. § 459; Whart. Cr. Ev. § 472; *Carroll* v. *State*, 24 S. W. Rep. 100; *Holder* v. *State*, 25 S. W. Rep. 279; *Turner* v. *King*, 32 S. W. Rep. 941. A defendant cannot be asked if he has been indicted for the purpose of impeaching him. *Van Bokkelen* v. *Berdell*, 130 N. Y. 141; *Peo.* v. *Crapo*, 76 N. Y. 291; *Peo.* v. *Irving*, 95 N. Y. 541; *Peo.* v. *Noelke*, 94 N. Y. 137; *Ryan* v. *Peo.*, 79 N. Y. 594; *Bates* v. *State*, 30 S. W. Rep. 890; *Tifft* v. *Moor*, 59 Barb. 619; *Hannah* v. *McKellip*, 49 Barb. 342. A witness cannot be impeached by proof of a series of facts from the existence of which the inference of the perpetration of a crime may be drawn. Questions for the purpose of impeachment must be directed to specific acts. Whart. Cr. Ev. § 432; *Schultz* v. *Third Ave. Ry. Co.*, 89 N. Y. 242, 250; *State* v. *Punshon*, 34 S. W. Rep. 25. The fact that defendant denied all insinuations of counsel, and crimes imputed to him on cross-examination does not show that he was not prejudiced by the examination. *Bates* v. *State*, 30 S. W. Rep. 890; *Peo.* v. *Wells*, 34 Pac. Rep. 1078; *Peo.* v. *Mullings*, 23 Pac. Rep. 229; *Gale* v. *People*, 26 Mich. 158. The introduction of exhibit "P" was error. When a party on cross-examination of a witness puts questions to him that are collateral or irrelevant to the issue he makes the witness his own, and he .has no right to contradict him by other testimony, but the statements of the witness in answer to such questions are conclusive against him. Greenleaf, Ev. § 449; *Stokes* v. *People*, 53 N. Y. 164; *Butler* v. *Cooper*, 42 Pac. Rep. 839; It is prejudicial error to allow counsel in argument to travel outside of the record, and indulge in the assertion of matters which have not been established by the testimony. *Graves* v. *United States*, 37 L. Ed. 1021; *Long* v. *State*, 56 Ind. 182; *Ferguson* v. *State*, 49 Ind. 33; *Coble* v. *Coble*, 28 Am. Rep. 339; *Angelo* v. *People*, 96 Ill. 209; *Brown* v. *Swineford*, 44

Wis. 282; *Tucker* v. *Henniker*, 41 N. H. 317; *Scripps* v. *Reily*, 35 Mich. 371; *Cleveland Paper Co.* v. *Banks*, 15 Neb. 20; *Fox* v. *Peo.*, 95 Ill. 71; *Earll* v. *People*, 99 Ill. 123; *Union Cent. Ins. Co.* v. *Cheever*, 36 Ohio St. 201; *Martin* v. *Orndorff*, 22 Ia. 505; *Hatch* v. *State*, 8 Tex. App. 416; *Laubach* v. *State*, 12 Tex. App. 583; *State* v. *Smith*, 1 Am. Cr. Repts. 580; *State* v. *Johnson*, 76 Mo. 121; Kerr on Homicide, § 306. The directions of the court to the jury did not cure the error. *Yoe* v. *People*, 49 Ill. 410; *State* v. *Smith*, 75 N. C. 307; *Tucker* v. *Henniker*, 41 N. H. 317; *Hatch* v. *State*, 8 Tex. App. 416; *Festner* v. *R. R. Co.*, 17 Neb. 280; *Rolfe* v. *Rumford*, 66 Me. 564; *Walker* v. *State*, 6 Blackf. (Ind.) 2; *Deckerson* v. *Burke*, 25 Ga. 225; *Crandall* v. *People*, 2 Lans. 309; *Sullivan* v. *State*, 66 Ala. 48; *McAdory* v. *State*, 62 Ala. 154; *Bulliner* v. *Peo.*, 95 Ill. 396; *Grosse* v. *State*, 11 Tex. App. 364. The separation of the jury was prejudicial error. *Eastwood* v. *People*, 3 Parker, Cr. Rep. 25; *Com.* v. *McCall*, 1 Va. 271; *State* v. *Church*, 64 N. W. Rep. 152; *People* v. *Brannigan*, 21 Cal. 338; *Riley* v. *State*, 9 Humph. 654; *McCann* v. *State*, 9 S. and M. 465. The burden of proof is upon the state to show that the prisoner suffered no injury by reason of the separation of the jury. *Maclin* v. *State*, 44 Ark. 115; *Keenan* v. *State*, 8 Wis. 132; *State* v. *Prescott*, 7 N. H. 287; *Moss* v. *Com.*, 6 Cr. L. Mag. 88. The court has no power to authorize the separation of the jury even with the consent of the prisoner. *Peiffer* v. *Com.*, 15 Pa. St. 466; *McLain* v. *State*, 10 Yerg. 241; *Hines* v. *State*, 8 Humph. 397; *Wesley* v. *State*, 11 Humph. 502; *State* v. *Prescott*, 7 N. H. 287; *Woods* v. *State*, 43 Miss. 369; *Organ* v. *State*, 26 Miss. 83; *Eastwood* v. *People*, 3 Parker Cr. Repts. 25. An erroneous instruction cannot be corrected by another instruction which states the law correctly. *Kingen* v. *State*, 45 Ind. 518; 2 Green Cr. Rep. 721; *Kirland* v. *State*, 43 Ind. 146, 2 Green Cr. Rep. 706; *Peo.* v. *Wang*, 54 Cal. 151; *Perry* v. *Com.*, 1 Am. Cr. Repts. 272; *Peo.* v. *Bush*, 65 Cal. 129; 5 Am. Cr. Repts. 459. Where instructions are requested that correctly state the law they should be given in the form in which they are prepared. *Middle-*

*ton* v. *State*, 1 Am. Cr. Repts. 194; *Hamilton* v. *People*, 1 Am. Cr. Repts. 618; *Anderson* v. *State*, 2 Am. Cr. Repts. 198; *State* v. *Stewart*, 2 Am. Cr. Repts. 603; *State* v. *Rothschild*, 3 Am. Cr. Repts. 326; *Cline* v. *State*, 5 Am. Cr. Repts. 57; *State* v. *Hecox*, 5 Am. Cr. Repts. 98; *Panton* v. *People*, 5 Am. Cr. Repts. 425; *People* v. *Bush*, 5 Am. Cr. Repts. 459; *State* v. *Moran*, 1 Green's Cr. Repts. 749; *Peo.* v. *Anderson*, 2 Green's Cr. Repts. 395.

*H. G. Voss, State's Atty., J. F. Cowan, Atty. Gen'l., (Wm. P. Miller,* of counsel,) for the state.

It is too late to raise any question of irregularity with respect to granting of the change of venue after verdict. *Ben Krebs* v. *State*, 8 Tex. App. 1; *Williams* v. *State*, 16 S. W. Rep. 816; *State* v. *Kindig*, 39 Pac. Rep. 1028; *State* v. *Gamble*, 24 S. W. Rep. 1030; *Hourigan* v. *Com.*, 23 S. W. Rep. 355; *State* v. *Dusenberry*, 20 S. W. Rep. 461; *Burrell* v. *State*, 28 N. E. Rep. 699; *State* v. *Potter*, 16 Kan. 80; *Porter* v. *State*, 5 Mo. 538. No juror was accepted by the state or defense before the order granting the change. *State* v. *Hazledahl*, 2 N. D. 521. It is the order granting the change of venue that confers jurisdiction on the court to which the case is sent. *State* v. *Dusenberry*, 20 S. W. Rep. 461. The objection to the sufficiency of the verification of the information is made too late. It being involved in the former trial of the case, it becomes *res adjudicata*, even though not particularly mentioned in the decision. *Everson* v. *Mayhew*, 85 Cal. 1; *Reclamation Dist.* v. *Goldman*, 65 Cal. 635; *Carr* v. *Qingley*, 16 Pac. Rep. 9; *Forgerson* v. *Smith*, 104 Ind. 246. Unsupported statements made by counsel, if the court in its instructions warns the jury that such unsupported statements must be disregarded by them, cannot be assigned as error. *Peo.* v. *Greenwall*, 115 N. Y. 520; *State* v. *McGahey*, 3 N. D. 293; *Miller* v. *State*, 25 S. W. Rep. 634; *Handly* v. *Com.*, 24 S. W. Rep. 609; *King* v. *State*, 24 S. W. Rep. 514; *Gibbs* v. *State*, 20 S. W. Rep. 919; *Griffin* v. *State*, 8 So. Rep. 670; *Hilton* v. *Com.*, 16 S. W. Rep. 826; *Palmer* v. *State*, 28 N. E. Rep. 130; *Sterling* v. *State*, 15 S. E. Rep.

743; *State* v. *Spencer,* 12 So. Rep. 137; *Hemingway* v. *State,* 8 So. Rep. 317. No error was committed in permitting witnesses other than those whose names were indorsed upon the information to testify. The objection should have been taken by motion and before pleading. Sections 7283, 7284, Comp. Laws. This statute is kept alive by § 5, Ch. 71, Laws 1890. The court may in its discretion allow witnesses to testify for the state, whose names are not endorsed upon the information. Section 2. Ch. 71, Laws 1890. And this is true especially when the defendant and his counsel knew who the witnesses would be, they having testified on· a former trial. *Peo.* v. *Freeland,* 6 Cal. 96; *Peo.* v. *Symonds,* 22 Cal. 349; *Peo.* v. *Lopez,* 26 Cal. 113; *State* v. *Townsend,* 35 Pac. Rep. 367; *Territory* v. *Godfrey,* 50 N. W. Rep. 481; *State* v. *Boughner,* 59 N. W. Rep. 736; *State* v. *Church,* 60 N. W. Rep. 143; *State* v. *Reddington,* 64 N. W. Rep. 170; *Simon* v. *People,* 36 N. E. Rep. 1019; *Gifford* v. *People,* 35 N. E. Rep. 754; *State* v. *Story,* 41 N. W. Rep. 12; *Kramer* v. *State,* 29 S. W. Rep. 157; *State* v. *Church,* 60 N. W. Rep. 143; *Thiede* v. *Territory,* 16 S. C. Rep. 62. The affidavits of persons to whom the jurors made statements after the verdict, as to alleged misconduct of the jury, are incompetent and cannot be considered. *State* v. *Fox,* 79 Mo. 109; *State* v. *Dunn,* 80 Mo. 681; *State* v. *Rush,* 8 S. W. Rep. 221; *Clark* v. *Creditor,* 57 Cal. 639; *Peo.* v. *Deegan,* 88 Cal. 602; *Peo.* v. *Gray,* 61 Cal. 164; *State* v. *Price,* 6 Am. Cr. Repts. 33; *Territory* v. *King,* 6 Dak. 131. The mere separation of the jury does not of itself constitute error. Section 7399, Comp. Laws; Subd. 3, § 7450, Comp. Laws; *Langford* v. *State,* 49 N. W. Rep. 766; *Peo.* v. *Bemmerley,* 98 Cal. 299; *Com.* v. *Gagle,* 18 N. E. Rep. 417; *State* v. *Harper,* 7 S. E. Rep. 730; *State* v. *Frier,* 24 S. W. Rep. 220; *Stanton* v. *State,* 13 Ark. 317; *State* v. *Kidd,* 56 N. W. Rep. 263; *People* v. *Wheatley,* 88 Cal. 114; *Peo.* v. *Kelley,* 46 Cal. 357; *Binns* v. *State.* 35 Ark. 118; *State* v. *Fairlamb,* 25 S. W. Rep. 895; *Peo.* v. *Simonds,* 22 Cal. 353. The question of fact raised by affidavits as to misconduct of the jury has been settled by the trial court, and like any other question of fact upon conflicting testimony will not be

reviewed in this court. ˙Baker v. State, 59 N. W. Rep. 570; State v. Floyd, 63 N. W. Rep. 1096; Peo. v. Buchanan, 39 N. E. Rep. 846; Peo. v. Bemmerley, 98 Cal. 299; Epps v. State, 102 Ind. 539; Long v. State, 95 Ind. 481; Clayton v. State, 100 Ind. 201; Murphy v. State, 61 N. W. Rep. 491; Downer v. Baxter, 30 Vt. 468; Carleton v. State, 61 N. W. Rep. 699; State v. Sullivan, 21 S. E. Rep. 4; Peo. ˙v. Hunt, 59 Cal. 430; Peo. v. Goldenson, 76 Cal. 328; Peo. v. Murray, 85 Cal. 361. The jurors did not separate except by order of court and consent of counsel for both the state and defendant. Such separation cannot be assigned as error. State v. Frier, 24 S. W. Rep. 220; Henning v. State, 6 N. E. Rep. 803. Defendants counsel had knowledge of any alleged misconduct of the jury, and could not set by without remonstrance or affirmative action, and take the˙ chance of securing an acquittal reserving at the same time a complete right to move for and obtain a new trial. State v. Floyd, 63 N. W. Rep. 1096; Ty. v. O'Hare, 1 N. D. 30; Com. v. Martin, 16 Pa. Co. Ct. 140; State v. Harrigan, 31 At.˙ Rep. 1052. It was competent to inquire of Earl Kent what his mothers appearance was at the time she received the letter, delivered by Swidensky. This was part of the res gestae, and not as claimed by plaintiff in error the declaration of a stranger. State v. Hayward, 65 N. W. Rep. 63. The acts and declarations of Swidensky both before and after the homicide done in pursuance of the common object, purpose and plan of the conspiracy were admissable against his˙co-conspirator, Kent. U. S. v. Lancaster, 44 Fed. Rep. 896; Gill v. State, 27 S. W. Rep. 598; Atkinson v. State, 30 S. W. Rep. 1064; Cline v. State, 30 S. W. Rep. 801; Whart. Cr. Ev. 698. And this is true although Swidensky was not a party to the. record. Whart. Cr. Ev. 700; Peo. v. McKane, 143 N. Y. 455; State v. Crab, 26 S. W. Rep. 548; State v. Pratt, 26 S. W. Rep. 556; St. Clair v. U. S., 154 U. S. 134; Peo. y. Fehrenbach, 36 Pac. Rep. 678; Blain v. State, 26 S. W. Rep. 63; Peo. v. Lane, 36 Pac. Rep. 16; Conde Sv. tate, 24 S. W. Rep. 415; Peo. v. Collins, 64 Cal. 293; Harris v. State, 20 S. W. Rep. 916. The order of proof was discretionary with the court. State v. Flanders, 23 S. W. Rep. 1086; Peo. v. McKane, 30

N. Y. Supp. 95, 143 N. Y. 455; *Hall* v. *State*, 12 So. Rep. 449. All preliminary inquiries as to the surrounding of the homicide were competent. *St. Clair* v. *U. S.*, 154 U. S. 134. To work a reversal it must appear that the substantial rights of the defendant have been prejudiced by the admission of irrelevant and immaterial testimony. Section 7439, Comp. Laws; *Odette* v. *State*, 62 N. W. Rep. 1054; *State* v. *Reddington*, 64 N. W. Rep. 170; *Moore* v. *State*, 28 S. W. Rep. 686; *State*, v. *Moore* 22 S. W. Rep. 1086. The allowance of a challenge for cause interposed by the state though erroneous is not a matter of exception and ground for error, on the part of the accused. Section 7439, Comp. Laws; *Thompson* v. *Douglass*, 13 S. E. Rep. 1015; *State* v. *Ching Ling*, 18 Pac. Rep. 844; *State* v. *Carris*, 3 So. Rep. 56; *Ty.* v. *Roberts*, 22 Pac. Rep. 132; *Hayes* v. *State*, 120 U. S. 68; *Maclin* v. *State*, 44 Ark. 115; *State* v. *Waggoner*, 3 So. Rep. 119. Whatever was said by the court was invited by counsel for the defendant grossly insulting the court, and error cannot be predicated thereon. The instruction of the court that "if the court has at any time in its discretion reprimanded counsel, or if the court·has·seemed angry toward counsel or counsel toward the court, you will not permit any such facts to influence you in the slightest degree" cured the error if there was one. *Peo.* v. *Northey*, 77 Cal. 618; *State* v. *Whiteworth*, 29 S. W. Rep. 595; *Peo.* v. *Leach*, 40 N. E. Rep. 865; *Com.* v. *Ward*, 157 Mass. 482; *Ryan* v. *State*, 53 N. W. Rep. 836; *Bone* v. *State*, 12 S. E. Rep. 205; *State* v. *Black*, 8 So. Rep. 594; *State* v. *White*, 39 Pac. Rep. 160. The defendant having circumstantially denied the entire story of Swidensky, any testimony offered which would assist in knowing which party speaks the truth of the issue, is relevant. *Trull* v. *True*, 33 Me. 367; 3 Rice on Ev. 69; *Seller* v. *Jenkins*, 97 Ind. 430. Defendant having denied any financial connection with the bank in Ohio, which in the light of Swidensky's testimony was relevant and material, the state had a right upon cross-examination to impeach him by the letter "P." 3 Rice on Ev. 72; *Coleman* v. *People*, 58 N. Y. 555; *Keyes* v. *State*, 122 Ind. 527.

Circumstances so trivial and remote in themselves that if individually and separately applied might justly be rejected may from their multitude and relation become important and relevant. *State* v. *Watkins*, 9 Conn. 52; Taylor on Ev. 298. Anything in the past life of the defendant which tended to disprove his denials of what Swidensky claimed the defendant had imparted to him, thereby corroborating Swidensky were relevant and material for such purpose, and also to disprove defendants denials: *Boyle* v. *State*, 105 Ind. 469; *Keyes* v. *State*, 122 Ind. 527; *Ford* v. *State*, 112 Ind. 373; *Welch* v. *State*, 104 Ind. 347; Whart. Cr. Ev. 484. Whether as to time, evidence offered to show motive is too remote, depends entirely upon the nature of the evidence. *Peo.* v. *Harris*, 136 N. Y. 423; *Moore* v. *U. S.*, 150 U. S. 57; *State* v. *Hoyt*, 46 Conn. 330; *Shailer* v. *Bumsted*, 99 Mass. 112. Relevant cross-examination competent to show motive will not be excluded though it has a tendency to show defendant guilty of another crime. *Peo.* v. *Walters*, 32 Pac. Rep. 864; *Peo.* v. *Sharp*, 107 N. Y. 467; *State* v. *Wells*, 37 Pac. Rep. 1005. However remote from the main issue in point of time, evidence tending to show motive is admissible. Its weight is for the jury. *Russell* v. *State*, 11 Tex. App. 288. Testimony is always relevant when it tends to show a motive for the crime. *Peo.* v. *Thornton*, 46 Hun. 643; *State* v. *Green*, 92 N. C. 779; *State* v. *Hoyt*, 46 Conn. 330; *Ty.* v. *Roberts*, 22 Pac. Rep. 132; *Reed* v. *State*, 68 Ala. 492. A defendant by voluntarily testifying waives all privilege, from being compelled to testify against himself, and becomes subject to cross-examination the same as any other witness. *Ty.* v. *O'Hare*, 1 N. D. 30; *Peo.* v. *Tice*, 131 N. Y. 657; *State* v. *Wells*, 37 Pac. Rep. 1005; *Brandon* v. *Peo.*, 42 N. Y. 265; *Peo.* v. *Webster*, 139 N. Y. 73, 22 N. Y. Supp. 634; *State* v. *Wentworth*, 65 Me. 234; *State* v. *Ober*, 52 N. H. 459; *State* v. *Cohn*, 9 Nev. 179; *Peo.* v. *Bussy*, 82 Mich. 49; *Thomas* v. *State*, 103 Ind. 419; *State* v. *Clinton*, 67 Mo. 380; *Peo.* v. *Rozelle*, 78 Cal. 84; *McKeone* v. *Peo.*, 6 Colo. 346; *State* v. *Phelps*, 59 N. W. Rep. 471. When the defendant is under cross-examination he may be interrogated as

to previous arrests and convictions and even as to mere charges of crime with a view to injuring his credit.    Rapalje Law of Witnesses, 337; *Peo.* v. *Foote*, 93 Mich. 38; *Peo.* v. *Robinson*, 49 N. W. Rep. 260; *State* v. *Klitzke*, 49 N. W. Rep. 54; *State* v. *Curtis*, 40 N. W. Rep. 263; *Peo.* v. *Howard*, 40 N. W. Rep. 789.    By swearing to tell the truth, the whole truth and nothing but the truth, the defendant waived all right to keep anything back even in the case of questions, the answers to which would tend to criminate him. *Com.* v. *Smith*, 163 Mass. 411; *State* v. *Allen*, 107 N. C. 805; *State* v. *Allen*, 11 S. E. Rep. 1016.

BARTHOLOMEW, J.    The plaintiff in error, William W. Pancoast, was informed against by the state's attorney of Morton County, under the name of Myron R. Kent; and, by such information, he was accused of the murder of one Julia C. Kent, in said county, on the 13th day of March, 1894.    The information was dated on the 8th day of November, 1894.    As the record refers to plaintiff in error by the nane of Kent, we shall use the same name in this opinion.    A trial of the case resulted in a verdict of guilty of murder in the first degree, and the death penalty was affixed. The judgment on the verdict was brought to this court by writ of error, and was reversed, by reason of the error of the trial court in refusing, upon a proper application, to call in another judge to sit in the case, and a new trial was ordered.    See 4 N. D. 577, 62 N. W. 631.    In due time, after the record in the case was returned to the District Court of Morton County, the application for another judge was renewed; and Hon. William B. McConnell, Judge of the Third Judicial District, was called to sit in the case. Subsequently, proceedings were had in the District Court of Morton County, and before Judge McConnell, that resulted in a change of the place of trial from Morton County, in the Sixth Judicial District, to Cass County, in the Third District.    A trial of the case in Cass County resulted in a second verdict of murder in the first degree, with the death penalty affixed.    The judgment pursuant to that verdict is now before us for review.    The trial of

N. D. R.—34

the case in District Court occupied some three weeks of time, and was most ably (even bitterly) contested on both sides.

There is an extended assignment of errors, all of which have been vigorously urged in this court. The first assignment of error that we shall consider relates to the jurisdiction of the District Court of Cass County to try the case. It was raised after verdict by motion in arrest. Without expressing any opinion as to whether or not it could properly be raised in that manner, we will dispose of it on its merits. The point is based upon the contention that the change of venue from Morton County was ordered after the trial had begun, and hence was unauthorized, under section 7312, Comp. Laws, which authorizes a change of venue in such cases "at any time before trial is begun," and, as the District Court of Morton County was without the power to order the change of venue at that time, the unauthorized order conferred no jurisdiction upon the District Court of Cass County. The facts were that, when the case was called for trial in Morton County, the plaintiff in error moved for change of place of trial, on the ground of bias and prejudice on the part of the inhabitants of said county. The motion was supported by affidavits, and counter affidavits were filed by the state, and oral evidence heard on the motion. The court denied the motion, but with leave to renew it later. An attempt was then made to impanel a jury, and jurors were called and examined on their *voir dire*, until the regular panel was exhausted, and no juror had been accepted. At that time the court intimated to counsel for plaintiff in error that, if the motion for change of venue was renewed, he felt inclined to grant it; whereupon plaintiff in error, both by counsel and in person, asked that the place of trial be changed to Cass County, and expressly agreed that the case should be tried in Cass County. The court, acting, we are bound to believe, upon the affidavits and evidence and the added knowledge that he had obtained in the attempt to impanel a jury, and upon the express agreement stated, ordered the place of trial changed to Cass County. We think that, so far as the simple change of venue

was concerned, it was strictly within the statute. There was no second application for the change. It was simply a renewal of the original application, made on the suggestion of the court, and in pursuance of leave expressly reserved in the original ruling, clearly showing that such ruling was tentative only. But, further, we do not think the trial had begun, within the meaning of the statute, when the application was renewed. In construing another section of the Code of Criminal Procedure, we held, in *State* v. *Hazledahl*, 2 N. D. 521, 52 N. W. 315, that the trial began after the jury was impaneled. It is clearly in the interests of justice to persons accused of crime that this section should receive the same construction, and there is ample authority to support this ruling. *Price* v. *State*, 8 Gill, 296; *Smith* v. *State*, 44 Md. 530; *Jenks* v. *State*, 39 Ind. 1; *Weaver* v. *State*, 83 Ind. 289; *Hunnel* v. *State*, 86 Ind. 431; *Edwards* v. *State*, 25 Ark. 444. The wording of section 8111 of the Revised Codes of this state differs to such an extent from the wording of section 7312 of the Compiled Laws, under which this action was tried, that we may be required to rule differently in cases tried under the Revised Codes. We take judicial notice, however, that Cass County is not a near or adjoining county to Morton, nor was it claimed that an impartial trial could not be had in any of the intermediate counties. But the District Court of Cass County had full jurisdiction to try felonies. Plaintiff in error asked that the case be sent to that county, and expressly agreed in open court that it might be tried in such county. It is well settled by the authorities that the right to a change of venue having been established, and having thus selected the tribunal by which he would be tried, such tribunal having full jurisdiction to try offenses of the kind charged, and having been tried by that tribunal, plaintiff in error cannot, after verdict, be heard to question the jurisdiction of the court, or to allege that the change should have been to some other county. *Lightfoot* v. *Com.*, 80 Ky. 524; *Hourigan* v. *Com.*, 94 Ky. 520, 23 S. W. 355; *State* v. *Potter*, 16 Kan. 80; *State* v. *Kindig*, (Kan. Sup.) 39 Pac. 1028; *People* v. *Fredericks*, 106 Cal. 555, 39 Pac. 944; *State* v. *Gamble*, 119 Mo. 427, 24 S. W. 1030.

When the case was called for trial in Cass County, plaintiff in error moved to set aside the information, on the ground that it was not verified as the law requires. The information was verified by the state's attorney of Morton County, to the effect that he believed it to be true. Without in any manner intimating that this was not a good verification, we think the motion came too late. Our statutes as found in the Compiled Laws of 1887, were framed when accused persons were presented by indictment, and not by information; but chapter 71 of the Laws of 1890 substitutes an information by the state's attorney for the indictment of a grand jury, and section 5 of said act declares that the proceedings under indictment should, "as near as may be, apply to prosecutions by informations." Section 7283 of the Compiled Laws specifies the ground for setting aside an indictment; and these grounds, as applied to an information, would cover a defective verification. The next section provides: "If the motion to set aside the indictment be not made, the defendant is precluded from afterwards taking the objections mentioned in the last section." The substance and almost the language of these provisions was borrowed from Minnesota. See Ch. 110, Gen. St. 1878. The Supreme Court of Minnesota, in *State* v. *Schumm* 47 Minn. 373, 50 N. W. 362, and *State* v. *Dick*, 47 Minn. 375, 50 N. W. 362, held that a motion to set aside the indictment could not be made after plea entered. In this case, plaintiff in error, prior to his first trial, was regularly arraigned, and pleaded not guilty. He has never withdrawn, or asked to withdraw, that plea for any purpose whatever, and hence the motion to set aside the information came too late. But counsel sought to save the point by motion in arrest. It has been held in Minnesota that a matter which might furnish a grouud for a motion to set aside an idictment cannot be raised by demurrer or in any manner except by such motion. *State* v. *Brecht*, 41 Minn. 50, 42 N. W. 602. By section 7452, Comp. Laws, the grounds for motion in arrest are the same as, and none other than, the grounds for a demurrer to the information, as specified in section 7292, Comp. Laws. As the objection under considera-

tion was proper ground for motion to set aside, and was not proper ground for demurrer, it follows that it cannot be raised by motion in arrest. Learned counsel admit in argument that the point could not be raised on demurrer, and this must be so because, under our practice, a demurrer goes only to the body of the information.

In the process of impaneling the trial jury, one Holzer was called as a juror, and was challenged by the state for cause. In support of this challenge, Holzer was examined under oath as to his qualifications. His answers disclosed a state of disqualification that would, as we view it, have fully warranted the court in sustaining the challenge. The record, however, recites: "The court denies the state's challenge for cause, and the state exercises a peremptory challenge. At this time the court sustains the challenge for cause." The plaintiff in error excepted to this last ruling, on the ground that its effect was to extend to the state an additional peremptory challenge. Prior to that time the state had exhausted five of the six peremptory challenges allowed by law. Subsequently one Cruso was called as a juror, and was challenged peremptorily by the state and stood aside. Plaintiff in error excepted to this ruling, upon the ground that the state had used its sixth and last peremptory challenge upon Holzer. These exceptions cannot be sustained. Nor can we for a moment entertain the suggestion that the trial court, by reversing its ruling as to the juror Holzer, manifested any bias or favoritism towards the state. Indeed, the suggestion approaches the absurd, as, had such been the case, the court would certainly have sustained the challenge for cause in the first instance, as in fact it ought to have done. In denying the challenge the state was wronged, and in changing the ruling the state had restored to it that which it had been improperly compelled to use in rejecting Holzer. It must, we think, be conceded, that a court may, in the process of impaneling a jury, reverse its own rulings; and, the last ruling being correct, it would, indeed, be a novel doctrine that

either party could assign as error that the court did not adhere to erroneous ruling. See *State* v. *Cohn*, 9 Nev. 179.

When the information was filed, the names of but two witnesses were indorsed thereon, and their testimony simply proved the *corpus delicti*, about which there was no controversy. Many other witnesses were called by the state and plaintiff in error, in each case, objected to such witnesses giving any testimony in the case, on the ground that their names were not indorsed on the information. Section 2, Ch. 71, Laws 1890, (being the statute authorizing prosecutions by information,) provides that the state's attorney shall indorse on the information "the names of all witnesses for the prosecution known to him at the time of filing the same; but other witnesses may testify on the trial of such cause in behalf of the prosecution thereof the same as if their names had been indorsed thereon." Similar statutory provisions, though usually more stringent in their terms, are almost universal. The practice of indorsing the names of witnesses for the prosecution upon the indictment or information has long prevailed in this country and England. The object is to apprise the accused beforehand of the names of the witnesses against him, to the end that he may investigate their characters and antecedents and be the better prepared to meet and overcome or weaken their testimony by counter testimony gathered in advance of the trial. It is repugnant to the instincts of justice that an accused should be required to battle, it may be for his life, in total ignorance of the witnesses by whose words the state expects to condemn him, and thus necessarily, wholly unprepared to subject them to those tests of accuracy and credibility so potent in the investigation of truth. In *People* v. *Hall*, 48 Mich. 482, 12 N. W. 665, the court said: "The court allowed the names of several witnesses to be added to the information during the trial, under objection, without any showing that they were not known earlier and in time to give defendant notice in season to anticipate their presence before trial. The statute is explicit that this shall be done before trial, where witnesses are

known. Section 7938 [Comp. Laws.] This is not a mere formality; and, wherever it has been provided for by statute, it has been treated as a substantial right." See, also, *State* v. *Reddington*, (S. D.) 64 N. W, 170.

When plaintiff in error objected to the testimony of witnesses whose names were not on the information, he offered to prove that such witnesses were known to the prosecuting attorney when the information was filed, and the court heard evidence on the point. The objection was overruled. If this ruling rested only upon the evidence adduced, we should hesitate to sustain it. Indeed, it is difficult to conceive how an information can be verified by the state's attorney without his having some definite knowledge of the source or sources of evidence upon which the state relies for a conviction. But in this case there had been one trial of the case. For months plaintiff in error had known who the important witnesses for the state were, and also what their testimony was. All the purposes for which the law required their names to be indorsed on the information had been fully met. Hence there could have been no prejudicial error in the court's ruling so far as it related to witnesses that were used on the former trial. Section 7250, Comp. Laws, reads: "No indictment is insufficient, nor can the trial, judgment, or other proceedings thereon be affected, by reason of a defect or imperfection in matter of form, which does not tend to the prejudice of the substantial rights of the defendant upon the merits." Two witnesses were used by the state on the second trial whose names were not on the information, and who were not used on the first, but it is clear from the evidence that they were not known to the prosecution when the information was filed. However, had this objection been seasonably made at the first trial, it might have proved fatal. We cannot indorse counsel's position that, under our statute, all witnesses can testify, whether their names are indorsed or not. We cannot permit the latter clause of the provision to thus emasculate and destroy the former. True, the statute says, "But other witnesses may testify for the state the

same as though their names were indorsed on the information;" but such "other" witnesses must be witnesses who were not known to the prosecutor when he filed ,the information. Prosecutions by information are an innovation. The law authorizing them places a great power in the hands of one man, and that power should not be abused. Public prosecutors must treat those whom they accuse of crime with perfect fairness.

Earle Kent, the son of deceased and the accused, was a witness for the state in this case, and several questions were asked this witness, and answered, over defendant's objections, which, standing alone, would have no bearing upon any issue in the case. But all such questions were preliminary in their nature, and become competent by reason of what followed either in his own testimony or that of the witness and accomplice Swidensky. This practice is universal and absolutely necessary to the due administration of justice, and no authorities need be cited to support it. A careful examination of this evidence discloses no legal prejudice to plaintiff in error.

A large number of assignments of error are directed against the rulings of the court upon the admission of evidence during the examination of the witness Swidensky. The testimony of this witness was exceedingly important. He was the confessed accomplice, the man who fired the shot that killed Mrs. Kent. Without his testimony it is safe to say that no conviction would have been secured on the trial. His story was revolting in its details, and, if true, showed a depth of depravity, both on his part and that of the plaintiff in error, that humanity seldom reaches. In view of the prominence of this witness in the case, we will notice these assignments at some length.

Two assignments relate to questions that were asked for the purpose of showing what personal property Kent had on his farm at the time of the murder. On the former trial, Kent's absence from home at the time of the murder, and his subsequent flight and efforts to elude officers that were in pursuit of him, were attempted to be accounted for on the theory that he had embez-

zled $300 or $400 belonging to certain insurance companies that he represented, and that he left home the day preceding the murder for the purpose of raising $300 with which to cover this shortage, and, failing in that, he fled, and tried to elude the officers, because he thought they were after him for that offense. The object of the state in asking the questions was to show that he had property out of which he could realize the sum of $300, and hence his story was false. True, this evidence might more properly have been reserved for rebuttal; but it is only in a few well recognized instances that error can be assigned upon the order of proof, certainly not in this instance.

Again, the witness was asked: "State what his [Kent's] habits were with respect to going and coming to the house and the office." This was proper. The witness testified that the conspiracy was first broached by Kent while witness was driving him from his house to his office. Kent testified to his habits in this respect, and his testimony agreed with that of the witness.

Another assignment is directed at a question that simply required the witness to state the circumstances under which he was arrested, and was clearly proper.

A number of assignments of error are directed against the little black book, known as "Exhibit C," that figured so prominently upon the former trial. It is sufficient here to say that it was a small blank book, such as is frequently carried in the pocket; and in it Swidensky swore that he had written out in full, but in the Bohemian language, and at Kent's dictation, just what he should say at the coroner's inquest concerning the manner in which Mrs. Kent met her death. He also testified that he finished the writing in the book on Sunday morning preceding the homicide, and that Kent urged him to study it until he had his story thoroughly committed to memory, and then destroy the book. But the book was on his person when he was arrested, and was taken by the sheriff. But, as the writing in the book was in the Bohemian language, the sheriff knew nothing about what it contained until months later. At the coroner's inquest held immediately after the

murder, Swidensky did tell practically the identical story that was afterwards found to be written in the book. This book was received in evidence over the objection of the defendant. We ruled in the former opinion that the book was properly received, but counsel again attack certain questions concerning the book, with great ability and zeal; insisting that they were asked simply to corroborate Swidensky's sworn statements, and that nothing that the accomplice may have done and nothing that he may do or say after the homicide can be used to corroborate him. Counsel misapplies the law relating to the corroboration of an accomplice. True it is that no conviction can be had upon the testimony of the accomplice alone; and it matters not how inherently probable that testimony may be. It may be so connected with and related to known facts and conditions as to render fabrication impossible, and produce absolute moral conviction of its truthfulness. Still, standing alone, it cannot, under the statute, warrant conviction. It must be corroborated by some evidence. tending to connect the accused with the commission of the offense, and this evidence must come from an entirely independent source. It may be but slight, and wholly insufficient in itself to procure a conviction; yet, if it reasonably tends to connect the defendant with the commission of the offense, the statute is satisfied. But in such a case the state must still place its main dependence for conviction upon the testimony of the accomplice. The corroborating testimony required by the statute may in no manner strengthen the particular facts to which the accomplice testifies. It is the right of the prosecution to make the testimony of the accomplice as strong and as inherently probable as the case will admit; and, because one portion of his testimony may tend to make another more probable,—may strengthen and support it,—he is not thereby corroborating himself, within the meaning of the statute. All the questions asked the witness for the purpose of showing under what circumstances and when the book was taken from him, and that it was in the

same condition when produced at the trial as when taken from him were clearly competent.

We have discussed only such assignments relating to Swidensky's testimony as are argued in the brief. Others were made, but an inspection shows them to be without merit, as counsel concedes by not arguing them.

A presumption of guilt arises from flight. This presumption will have more or less force, according to the facts and circumstances attending it. But the flight, with its attendant facts and circumstances, can alway go to the jury, under the instructions of the court as to how its effect should be weighed. Whart. Cr. Ev. § 1269, and cases cited. For the purpose of showing flight and secretion, the sheriff of Morton County was asked and permitted to answer a series of questions tending to disclose what he did by way of locating and arresting the defendant, between the time of the commission of the murder and his final arrest, on September 2d following. While learned counsel do not strenuously contend that the general purport of this examination was improper, yet he does urge that certain portions of the answers of the witness had no tendency to establish the ultimate fact sought; hence it was error to receive such portions, or permit them to stand. We may concede counsel's proposition that some portions of the testimony did not necessarily tend to show flight. For instance, the facts that the sheriff got out a large number of circulars, or sent telegrams, from which he received no results, may not strongly tend to establish flight or secretion. But we are by no means prepared to accept counsel's conclusion that this is necessarily reversible error. We do not believe there is a court of last resort in the United States that would hold to-day that the admission of improper testimony is necessarily and in every instance ground for reversal. Certainly, the authorities cited do not support the doctrine. It is true, generally speaking, and particularly in criminal cases, that prejudice will be presumed from the admission of improper testimony; and, when the influence of such testimony upon the jury is to any extent a doubtful question,

courts can indulge in no speculations, but must conclusively presume prejudice, and correct the error. But when, from the character of the irrelevant testimony or from the record, it is clear·that no prejudice could result in any conceivable view of the case, then the admission of such improper testimony should never reverse the case. This is the rule of reason and justice, as well as of authority. *McMillen* v. *Aitchison*, 3 N. D. 185, 54 N. W. 1030; *State* v. *McGahey*, 3 N. D. 293, 55 N. W. 753; *Hegar* v. *DeGroat*, 3 N. D. 354, 56 N. W. 150; *Colemant* v. *People*, 2 Cow. Cr. R. 19; *Vandervoort* v. *Gould*, 36 N. Y. 639; *Erben* v. *Lorillard*, 19 N. Y. 299. In this case the defendant himself, on the stand, testifies that he left his home, in Morton County, on the morning of the day preceding that on which the murder was committed, and for nearly six months thereafter he spent the time at out of the way places in Michigan, Nebraska, and Colorado. He also swears that during this time he passed under several different names, none of them being his real name of William W. Pancoast or his assumed name of Myron R. Kent. He also admits that he changed his locality to avoid apprehension. The flight and secretion are so indisputably established that no prejudice to defendant could possibly have resulted from permitting the sheriff to testify that he sent out circulars and telegrams in his efforts to locate and apprehend the defendant. The error, if any, was entirely harmless.

A vigorous attack is made upon certain rulings relative to the evidence of the witness Hoy. This witness was a detective, and was no doubt largely instrumental in procuring the arrest and conviction of the defendant. It is perhaps natural that counsel, in his zeal, should assail this witness with some bitterness. We have examined his testimony and the rulings thereon with utmost care, and we find absolutely no error connected therewith. Nor do we conceive that the rulings raise any questions of law whatever that are not too elementary to warrant any discussion. We mention the matter simply that counsel may understand that it was not overlooked.

The plaintiff in error took the witness stand in his own behalf, and, in discussing the questions that arise upon the exceptions saved on his cross-examination, we must keep constantly in mind certain well settled principles. The object of a cross-examination is to break or weaken the force of the testimony given by the witness on his direct examination. To this end, it is always proper to show the relations of the witness to the case and the parties, the interest, if any, he may have in the result, his motives for testifying in any particular manner. Likewise, it is proper to show his relation to the facts, his means of knowledge, and opportunities for information, his powers of observation, and his tenacity of memory; and, subject to the constitutional privilege of a witness to refuse to answer questions the answers to which may tend to criminate him, it is proper to show collateral facts that might tend to criminate, disgrace, or degrade the witness if such other facts tend to weaken his credibility. *Territory* v. *O'Hare*, 1 N. D. 30, 44 N. W. 1003; *People* v. *Casey*, 72 N. Y. 394; *People* v. *Irving*, 95 N. Y. 541; *U. S.* v. *Wood*, (Dak.) 33 N. W. 59; *State* v. *McCartey*, 17 Minn. 76, (Gil. 54;) *Wilbur* v. *Flood*, 16 Mich. 40. It is also well established that, when a defendant in a criminal case voluntarily takes the witness stand in his own behalf, he thereby subjects himself to the same rules of cross-examination that govern other witnesses, with the exception that his privileges are to some extent curtailed, in that he is not only required to answer any relevant and proper question on cross-examination that may tend to convict him of the offense for which he is being tried, but he must also answer any such relevant and proper question that may tend to convict him of any collateral offense, when such answer also tends to convict him of the offense for which he is being tried, or bears upon any of the issues involved in such case. *Connors* v. *People*, 50 N. Y. 240; *People* v. *Howard*, 73 Mich. 10, 40 N. W. 789; *State* v. *Ober*, 13 Am. Rep. 88; *People* v. *Courtney*, 31 Hun. 199; *Chambers* v. *People*, 105 Ill. 409; *McKeone* v. *People*, 6 Colo. 346; *Fralich* v. *People*, 65 Barb. 48; *State* v. *Wentworth*, 65 Me. 234; *Hanoff* v.

*State*, 37 Ohio St. 180; *State* v. *Pfefferle*, 36 Kan. 90, 12 Pac. 406; *Boyle* v. *State*, 105 Ind. 469, 5 N. E. 203; *Keyes* v. *State*, 122 Ind. 528, 23 N. E. 1097; *People* v. *Court of Oyer and Terminer of New York Co.*, 83 N. Y. 436; *People* v. *Hooghkerk*, 96 N. Y. 149; *State* v. *Red*, 53 Iowa, 69, 4 N. W. 831; *Clarke* v. *State*, 78 Ala. 474; *Cotton* v. *State*, 87 Ala. 103, 6 South, 372; *Norris* v. *State*, 87 Ala. 85, 6 South. 371. The cross-examination of plaintiff in error in this case was greatly extended, occupying several days, and covering his past life since 1873. The questions raised upon this cross-examination cover a wide range in criminal evidence, are very interesting, and not free from difficulty.

It is undisputed in this case that Julia C. Kent was murdered by the direct act of Thomas Swidensky, between 11 and 12 o'clock on the night of March 13, 1894. Death was caused by the discharge of a shotgun held, at most, but a few feet from her head. The tragedy occurred in the house where plaintiff in error and Julia C. Kent, his wife, had lived for about a year and a half then last past, on a farm about one mile and a quarter from the City of Mandan, in Morton County. Plaintiff in error was a lawyer, with an office in Mandan, and it was his general custom to go from his home to the city in the morning, and return in the evening. It was the theory of the state that plaintiff in error hired the man Swidensky to kill Mrs. Kent, or, in other words, that plaintiff in error and Swidensky entered into a conspiracy to accomplish that object. Swidensky was a Bohemian laborer, who had been in Kent's employ for some time. His testimony indicates that he is a man of considerable intelligence. He was a witness for the state, and his testimony was vital. Without it no conviction could have been expected on the testimony adduced. He testified in detail to an arrangement which he claimed was entered into between ptaintiff in error and himself, and said that, early in February preceding, Kent broached the subject to him one morning, while they were driving to Mandan; that Kent said to him, "I am going to tell you something. There is a big thing in it if you promise not to give it away." Then, as preliminary,

Kent proceeded with a statement that he "was pretty well fixed" in Minneapolis, but lost $15,000 in a mining deal in California, through his wife's brother Frank; that his wife urged him to go into the deal, but, as soon as his money was gone, Frank Laird "was after him, to drive him out of Minneapolis." He then said to witness: "Now, Tom, I am going to get $30,000 from England, from my mother. As soon as my wife hears about it, the first thing she will want to do, she will want to go straight to Minneapolis, where her folks are, and they will want to handle my money again, and I will be in the same fix I was before." Further, witness testified: "He said, 'Tom, I will tell you what to do, and will give you $18,000 if you will help me to get rid of my wife.'" Witness refused to consider the proposition, and Kent proceeded to urge him, by representing the great financial advantage to witness. The next day, Kent approached him again, and witness still refused, saying he was "afraid they would hang him." But at every opportunity Kent continued to importune him, and developed the whole scheme by which it could be made to appear that the killing was accidental, so that Swidensky would be released after the coroner's inquest. Kent should be away, and should proceed to England, get the money, meet Swidensky at a town in the Indian Territory, and pay him the $18,000. Witness still refused, stating that he did not want to kill Mrs. Kent, that she had always been good to him, and that he was afraid. In one interview, Kent said to witness: "Kent is not my right name; my name is W. W. Pancoast. I changed my name the time I put away my first wife, and took $25,000 out of a bank in Ohio. Then I went to England. I got some of that money there, and I got it now." Then Kent said: "Tom, my wife is suspicious about something, and I cannot let it go much longer. I am afraid she will get onto it some way or other." Finally, witness says that, on the Saturday before the homicide, he accepted the the offer; and, at Kent's dictation, he wrote down in a book, while in the barn, detailed instructions as to what he was to do and say.

Plaintiff in error, when on the witness stand, testified on his direct examination as follows: "I am the defendant here. I am the husband of Julia C. Kent. I have heard the testimony of Thomas Swidensky. I heard his testimony in regard to my having approached him some time in the month of February, 1894, while on the road to the City of Mandan, when he said I suggested the idea to him that I wanted to get rid of my wife. His statement is false. I never, at any time, place or manner, suggested to Thomas Swidensky that I wanted to get rid of my wife." Again he. said: "I heard Swidensky's statement that I importuned him in the month of February to destroy my wife, assigning as a reason that she was suspicious of me, and was getting onto something, and that there was a big insurance on her life. There never was anything of that kind said or done." And, further: "Swidensky's statement that I importuned him from time to time, and finally, on the 9th of March, made a contract with him, by which he was to kill my wife, and was to receive the sum of $18,000, is false as false can be. Never was such a thing ever thought of, either in my heart, mind, or brain. * * * I also heard his statement in regard to this book, that, some time during the week preceding the homicide, I had conversations in the barn and vicinity, in which I dictated to him certain things which have been introduced here as part of this book. That statement is all false. I never was in the barn and dictated to him one word in my life concerning this or any other crime, or any other act. * * * I heard Tom's testimony that on Saturday night he finished writing this story in the cow shed, sitting on a little box, and that I dictated it to him, and that Sunday morning he finished it. That statement is false as can be. I never did such a thing. * * * I never heard of such a thing that I was to meet Tom at the Cherokee Nation, and there deliver to him $18,000, until I heard his testimony. It is false. All of his statements in regard to shooting my wife, or pretending that burglars were around the house, and that he should say that the shooting was accidental, etc., are untrue. There never was such an arrangement made."

We think it should be conceded for these denials that they fully and fairly deny that any conspiracy, arrangement, plan, or understanding was entered into or existed between plaintiff in error and Swidensky, for killing Julia C. Kent; and, the conspiracy being thus denied, it follows that everything in Swidensky's testimony that tends to establish such conspiracy is denied. It will be conceded by the state that, in his direct examination, plaintiff in error said nothing in terms about his past life, or his connection with any bank in Ohio, or the death of his first wife, or what name he had traveled under, or where his parents resided, or when he last saw them. The cross-examination of plaintiff in error went immediately to a time when he lived in Medina, Ohio, in 1873; and the following questions were asked, all of which were objected to as incompetent, irrelevant, immaterial, and improper cross-examination, the objection being overruled in each instance: "Q. Were your parents there? A. They were living in the same county, about fifteen miles from Medina. Q. What business were you engaged in, in Medina, Ohio, in the year 1873, or about that time? A. I was interested in the First National Bank. I was one of the directors. In 1873 I was cashier. I was married at the time. Q. When did your first wife die? A. In April, 1873. Q. What month was it you left Ohio? A. * * * It was the following year, in May. Q. Did your wife die suddenly? A. She did. She was not ill but a couple of weeks, but had been ill at times for over a year. Q. What happened this week before you left Ohio? A. Nothing that I personally know of. Q. Was there anything that you heard of? A. I heard that the bank was in difficulty. Q. How long did you hear that the bank was in difficulty before you left Ohio? A. I should think it was only one day," etc. "Q. What was your name at this time,—that is, under what name were you known? A. W. W. Pancoast. Q. Where did you go when you left Ohio at this time?" This question and all that we hereafter quote were objected to on the following grounds: "That it is incompetent,

irrelevant, immaterial, improper cross-examination, an attack on character on a collateral matter drawn out on cross-examination, and declines to answer the question, on the ground that the statements are privileged, which privilege is claimed by both counsel and defendant, and that the question is asked for the sole and exclusive purpose of prejudicing him in the eyes of the jury, and declines to answer the question on the ground that it may disgrace him." The objection was overruled in each instance. The witness answered: "I went to Toronto, Canada. Q. Where did you go then? A. I went to Liverpool. Q. Under what name were you known when you went to Liverpool? A. I assumed the name of Angel Herrick. Q. You lived under that name during your entire stay in England? A. Yes sir. Q. Is it not a fact that you went away [from Ohio] knowing that you were accused of having embezzled the funds of that bank yourself? A. I never did appropriate the funds. No sir; there was no such accusation against me. Q. Don't you know that it is true that you were accused of having taken $7,000 worth of bonds belonging to another person, and $7,000 worth of bonds of your own brother's, and made use of those bonds, never having entered the transaction upon the books of the bank, and after you went away from Medina, Ohio, you wrote a letter to your brother trying to make an explanation of your connection with that bank, and the disposition of the funds of the bank by you? A. No sir; that is not true. I can explain that." This same letter was afterwards introduced in evidence by the state, as Exhibit P, for the purpose of contradicting the witness. Again, the witness was asked, under the same objection: "Q. Now, between the period when you claim you left Ohio, in 1874, until 1879, when you say you went to Chicago, had you been back to the state of Ohio? A. No sir. Have you seen your mother at all up to 1879, between the time you left Ohio and your visit to Chicago? A. No, sir. Q. Mr. Kent, when and where did you see your parents last? A. I think it was in 1874." Much more of the cross-examination is of a similar purport, but we have quoted enough to explain our rulings. The learned counsel

for the state claim that this cross-examination was proper for three purposes: First, to show Kent's motive for desiring to have his wife put out of the way; second, to corroborate the testimony of Swidensky as to what Kent told him; and, third, to destroy or weaken the credibility of the witness. The counsel for plaintiff in error claim that this cross-examination was proper for no purpose.

It must be conceded that, to be competent for either the first or second purposes claimed, it must be proper cross-examination; that is, it must be relevant, and must pertain to the matter about which the witness testified in his direct examination. While it would be entirely proper for the state, by witnesses for the prosecution, to show Kent's motives, and to corroborate Swidensky by any testimony competent for these purposes, yet it could not accomplish those results through this witness, unless the direct examination had opened the door. We are aware that cases may be found opposed to this statement. See *State* v. *Allen*, 107 N. C. 805, 11 S. E. 1016; *Disque* v. *State*, 49 N. J. Law, 249, 8 Atl. 281; *Com.* v. *Lannan*, 13 Allen, 563; *Com.* v. *Tolliver*, 119 Mass. 312. But in those jurisdictions the more liberal English rule of cross-examination exists, and not the strict American rule, which limits it to the particular subjects covered by the direct examination. Greenl. Ev. § 445; Whart. Law Ev. § 529; Rice, Ev. p. 585. But, while the strict rule limits the cross-examination to the subjects about which the witness testified in chief, this does not mean the particular facts to which the witness directed his testimony Any subject that has been opened may be exhausted. A defendant, on the witness stand, cannot testify to just such facts as may be in his favor, and, by stopping there, preclude inquiry into all the facts pertaining to the subject. See cases already cited. There are statutes in some of the states limiting the cross-examination of defendants in criminal cases, and, under these statutes, a stricter rule of cross-examination has been enforced by the courts. But we have no such statute in this state, and certainly the administration of justice does not require this limi-

tation upon the ascertainment of truth. In this case, plaintiff in error, on direct examination, made his denials so broad that he necessarily denied his guilt, denied the existence of any conspiracy, and denied all the statements of Swidensky concerning the formation of a conspiracy, denied the motives as stated by Swidensky, and hence denied the statements upon which Swidensky testified those motives were based. We restate what Swidensky testified Kent said to him: "Kent is not my right name. My name is W. W. Pancoast. I changed my name the time I put away my first wife, and took $25,000 out of a bank in Ohio. Then I went to England. I got some of that money there, and I got that now. Then Mr. Kent said, 'Tom, my wife is suspicious about something, and I cannot let it go much longer. I am afraid she will get onto it some way or other.'" Here is a sworn statement of the admission of the commission of at least one heinous crime, and also a statement that his wife was suspicious of something, and that he could not let it go much longer, because he was afraid she might unearth the crime committed in Ohio. All this was denied, in effect, by the direct examination of plaintiff in error. We do not care to say in this case, and it is not necessary that we should say, that the proof that he committed the crimes alluded to would furnish any legal proof that he told Swidensky that he committed such crimes. We do not say whether such evidence would or would not weaken his denial, or corroborate Swidensky. There is a deeper question behind, and that is the question of motive. Plaintiff in error had denied what Swidensky had testified was his self-declared motive; and, the subject of motive being thus opened up, it was proper to cross-examine him upon the entire subject. And, indeed, there are authorities (and they are supported by good reasoning) which would admit a cross-examination as to motive under nothing more on the direct examination than a general denial of the crime, or even less than that. *Thomas* v. *State*, 103 Ind. 419, 2 N. E. 808; *Com.* v. *Clark*, 145 Mass. 251, 13 N. E. 888; *People* v. *Tice*, 131 N. Y. 651, 30 N. E. 494; *U. S.* v. *Mullaney*, 32 Fed. 370.

There is ample authority for the proof of alias and collateral crimes for the purpose of showing a motive for the commission of the crime for which a defendant is being tried; the limitation being that such alias crime must bear such a relation to the crime for which the party is being tried that a court can clearly see that, if established, it will have a tendency to furnish a motive for the commission of the other crime. *People* v. *Bussey*, 82 Mich. 49, 46 N. W. 97; *Farris* v. *People*, (Ill. Sup.) 21 N. E. 821; *People* v. *Harris*, 136 N. Y. 423, 33 N. E. 65; *State* v. *Hoyt*, 46 Conn. 330; *Moore* v. *U. S.*, 150 U. S. 57, 14 Sup. Ct. 26; *Com.* v. *McCarthy*, 119 Mass. 354; *Crass* v. *State*, (Tex. Cr. App.) 20 S. W. 579; *State* v. *Cohn*, 9 Nev. 179; *State* v. *Dearborn*, 59 N. H. 348; *Oliver* v. *State*, (Tex. Cr. App.) 28 S. W. 202; *State* v. *Watkins*, 9 Conn. 52.

This case is unusual in its facts. The proof of the commission of the crime or crimes at Medina, Ohio, would not, as we view it, have had any legal tendency to furnish a motive for the murder of Julia C. Kent, but for the declared state of mind, according to Swidensky's testimony, under which Kent was laboring. It was the theory of the state that Kent believed that Mrs. Kent was suspicious of something; that he was haunted with a fear or dread that she might become cognizant of certain crimes that he had committed in Ohio; and that this fear was the motive that actuated him in conspiring for her death. Obviously, this theory of the motive would be greatly strengthened by proof that he had committed the specified crimes in Ohio. While it is true that, in the cases where proof of a collateral crime has been admitted for the purpose of showing motive, the relation between the two crimes was usually such as to indicate that the latter was committed in order to prevent an investigation into and an exposure of the former crime, that it was feared would be followed by prosecution and punished, yet we can discover no reason in principle for the limitation of the rule to that class of cases strictly. Any strong incentive must furnish an equally cogent reason for the admission of such testimony. It may be true in this case, as counsel learnedly argue, that plaintiff in error had no reasonable ground

to apprehend prosecution for his past crimes, if any there were, as a result of his wife's suspicions or investigations. He was her husband, and had been such for nearly twelve years. He was the father of her only child, and to expose him to the world as a felon would bring disgrace upon herself and an indelible stigma upon her son. But whoever reads the record in this case, and particularly Kent's letters, will be irresistibly impressed with the thought that Kent at all times assumed high moral grounds, with an exalted standard of personal purity. There is evidence tending to show that he claimed for himself a higher social position than he was willing to concede to his wife. Under these circumstances, it would be intolerably galling to him to have his wife learn that he was in fact a felon, that he had married her under an assumed name, and that during all these years he had led a life of duplicity and hypocrisy. But courts cannot speculate as to the sufficiency of the motive. It cannot be doubted that the evidence tended to show a motive; and that motive that might be all powerful with one man might be of little or no force whatever with another, depending upon temperament and natural or acquired tendencies, and particularly upon the predisposition to commit crime.

In this connection it is proper to remark that there is an exhibit in the record (Exhibit L,) being a letter written by plaintiff in error to his wife in 1892, which clearly shows that Mrs. Kent was suspicious of her husband. The letter was in answer to one written by her, and the contents of hers can be gathered from his reply; and it is certain that Mrs. Kent had at least suggested an investigation of her husband's past life. This exhibit was properly admitted in evidence.

There is another exhibit, marked "P," which was admitted over objections. This was a letter written in——by plaintiff in error to his brother, from Ostend, Belgium. The state claims that this letter contains an admission of the crime in connection with the bank at Medina. It certainly will admit of such a construction, and as we have held that it was proper to prove that crime for the

purpose of showing motive, and as the letter was competent, in that it tended to prove that crime, its admission was not error.

The evidence showing that Kent's parents resided near Medina, Ohio, and that Kent had not seen them since 1874, was introduced for the purpose of showing that there was some reason for his avoiding that locality, and thus indirectly furnishing proof of the crime. The inference is neither plain nor strong, and yet we cannot say that the evidence had no probative force in that direction. It may be that the public prosecutor's duty would have been fully performed without pressing these inquiries to the extent that they were pressed, but we discover no reversible error in so doing. Nor can we sanction the views of the learned counsel that these collateral crimes were too remote in time to furnish any motive for the commission of the crime here charged. Motive may or may not be affected by the lapse of time. Ordinarily, a man who had committed a murder twenty years in the past would be just as much concerned to prevent exposure and punishment for that crime as though it were but one year in the past. And in this case, if the discovery by Mrs. Kent, at the time of her death, of these dark and criminal spots in her husband's life, would have been just as galling and humiliating to him as if discovered the first year of their married life, then his motive to prevent such discovery would be just as strong at the former time as at the latter.

Having held that this cross-examination was proper for the purpose of showing motive, we might here leave this branch of the case, but the question of the propriety of such examination as affecting the credibility of the witness is squarely raised upon the record, is important in its bearing upon other matters in the case, and its decision has been urged upon us by counsel upon both sides, in arguments that evidence unusual research and care. We shall therefore proceed to state without elaboration our views upon the point.

We have already stated that, for the purpose of affecting his credibility, a witness may be asked questions the answers to which

may tend to disgrace, degrade, and criminate him. In *People* v. *Brown*, 72 N. Y. 571, and *People* v. *Crapo*, 76 N. Y. 288, an effort seems to have been made to break away from the rule which burdens a defendant in a criminal case who becomes a witness in his own behalf with the same latitude of cross-examination which may be applied to every other witness, so far as an attack upon his credibility by proof of collateral crimes was concerned. But we discover no reason sufficiently persuasive to induce us to depart from the rule. It is said, in effect, in those cases, and is urged upon us in argument, that to prove by an ordinary witness criminal transactions in his past life has no effect other than to weaken the credibility of the witness, while to adopt the same course with a defendant not only weakens his credibility, but also tends to so prejudice him in the minds of the jury as to increase the probabilities of a verdict of guilty at their hands. But this same argument would preclude proof of any collateral crime, however relevant and pertinent to the issues in the case, because the prejudice arising from proof of the collateral crime would be just as great in one case as the other. But guarded, as a defendant in a criminal case always should be, by the instructions of the court, and as he is by his constitutional privilege to refuse to answer any question when the answer might tend to criminate him, and by the rule of law which makes his answers on collateral matters absolutely conclusive upon the opposite party, we think apprehension of injustice resulting from the enforcement of the rule has no sufficient warrant, and rests, indeed, almost exclusively in imagination. The contrary rule would present a temptation to commit perjury that few men with criminal instincts would resist.

But neither can we take the view that by becoming a witness in the case, and thus subjecting himself to a cross-examination that might tend to convict him of the crime for which he is on trial, thereby a defendant waives all protection, and has no longer any right to invoke his constitutional privilege of declining to answer questions the answers to which might criminate him. Counsel

for the state urges this view with great plausibility, but we do not think there is an authority that supports him.   It is true that in *Com.* v. *Smith*, 163 Mass., the court say, at page 432, (40 N. E. 189:)   "Nor can we assent to the doctrine that the waiver by defendant of his constitutional privilege is partial only.   By becoming a witness, he throws away his shield."   But this language is qualified by what subsequently appears in the opinion: "If, however, he seeks the benefit of testifying, he cannot stop short with matters that are favorable to himself, but must submit to be questioned also as to relevant matters which are adverse." This brings the case in harmony with the general line of authorities already cited.   We find nothing that necessarily goes further in *Com.* v. *Tolliver*, 119 Mass. 312, or *Com.* v. *Nichols*, 114 Mass. 285, or *Com.* v. *Mullen*, 97 Mass. 545.   In *State* v. *Allen*, 107 N. C. 815, 11 S. E. 1016, cited by counsel, the court say:   "He cannot be compelled to testify, and no inference to his detriment can be drawn from his failure to go upon the stand.   When he voluntarily does so, he waives his constitutional privilege of not being required to give evidence tending to criminate himself, and, to impeach him and shake his evidence, can be asked questions as to other and distinct offenses like any other witness."   This announces the general rule, and no more.   Both authority and reason demand that, when a defendant in a criminal case takes the witness stand, his constitutional privilege should furnish him the same protection and immunity that it furnished any other witness.   The law's solicitude that no innocent man be punished, and that every man accused of crime be tried by a jury unswayed by prejudice or passion, furnishes ample excuse for the constant tendency in many courts to strengthen the protective armor of a defendant when on the witness stand.   But exact justice is better served when his credibility receives the same protection that shields that of every witness who goes into the witness box, and nothing more.

But it is urged by plaintiff in error that, regarding this cross-examination as an attack upon his credibility, his constitutional

privilege was repeatedly denied. Our constitutional provison declares that "no person shall be compelled in any criminal case to be a witness against himself" (Const. Art. 1, § 13,) which is identical with the provision in the federal constitution, and in the constitutions of New York, California, Georgia, and perhaps some others. In considering this point, we must first determine whether or not this privilege was properly claimed. We have already quoted the form in which the claim was made. The material portion consists in the statement that the question was "an attack on character on a collateral matter drawn out on cross-examination, and declines to answer the question, on the ground that the statements are priviledged, which privilege is claimed by both counsel and the defendant." It is urged by the prosecution that this claim is too indefinite and ambiguous, and that it cannot be made by counsel, but must be made by the defendant in person. We find no instance where the claim has ever been put forward in this language, and we think counsel, in his efforts to avoid making a record that might serve as a basis for unfavorable comment to the jury, failed to make an objection upon which a court could intelligently rule. This matter of claiming the constitutional exemption is not a mere form,—not a barricade behind which a witness can take shelter at his pleasure, and without incurring the risk of some injurious consequences to himself. It is doubtless true that, when a witness declines to answer on the ground that his answer will tend to criminate him, a jury will always draw a conclusion more or less unfavorable to him by reason of his refusal. But that is the price he must pay for his protection. He can claim his privilege on no other ground, and, if he refuses to disclose that basis for his claim, he cannot be heard to complain that his claim was denied. Whether or not this claim could properly be made by counsel is a more difficult question. This privilege is a personal matter, which a witness may always waive at his pleasure. 3 Rice, Ev. § 204. And, with respect to an ordinary witness, counsel in the case can have no legal interest in the matter of his protection. It is purely a

question between the witness and the court. *Cloyes* v. *Thayer*, 3 Hill, 564; *Southard* v. *Rexford*, 6 Cow. 254. Not only must the witness claim the privilege in person, but he must state under oath that the answer will tend to criminate him. See 1 Rose, Cr. Ev. 232 *et seq.*; *Kirschner* v. *State*, 9 Wis. 140; *People* v. *Kelly*, 24 N. Y. 74-83; *People* v. *Seaman*, (Sup.) 29 N. Y. Supp. 329-333. And this ought to be so on principle. The privilege is not given to screen the credibility of the witness. The opposite party has the absolute right to impeach that credibility in the case on trial. But he has no right to compel the witness to furnish an admission that might be used against him in a prosecution for the offense about which he is interrogated. If the witness, on his oath, declines to answer, because his answer will tend to criminate him, his credibility stands impeached before the jury, as fully as if he had answered in the affirmative; but no admission is left that could ever be used against him. In many jurisdictions it is statutory that a witness shall not be excused from answering questions, upon the ground that his answers will tend to criminate him, but that his answers cannot be used in any case against him. Of course, under such statutes, he is protected from furnishing evidence to be used against himself, but his constitutional privilege of silence is swept away.

We must not be understood to mean that, in every case where a witness under oath claims his privilege on the ground that his answer will tend to criminate him, the privilege will be granted. Ordinarily it will, and the witness cannot be required to specify in what manner his answer may be incriminating. This would be to destroy the privilege. But, when a court can discover no reasonable theory upon which the answer could be incriminating, further investigation may be made, or the privilege denied. A witness will not be permitted to make any fraudulent use of his privilege. For full discussion of this point, see 3 Rice, Ev. § 203 *et seq.* This case, however, presents a still further complication, in that the witness was also a party, and a party most vitally interested. Generally speaking, a party to an action in court

speaks through his counsel.   It is the right and duty of counsel to protect his client at every point.   These considerations led the court of appeals in New York, in *People* v. *Brown*, 72 N. Y. 571, and in the Supreme Court of Iowa, in *Clifton* v. *Granger*, 86 Iowa, 573, 53 N. W. 316, to hold that this privilege could be claimed by counsel when the witness was also a party.   But there is a practical difficulty in such a holding that was not discussed in either of these cases.   The claim of privilege, when made by counsel alone, even when, as in this case, counsel says, "The privilege is claimed by both counsel and the defendant," is not, and cannot be, supported by the oath of the witness.   This, as we have seen, is demanded both by authority and reason, and we can conceive of no sufficient ground to support an exception in favor of a party.   *State* v. *Wentworth*, 65 Me. 234.   No doubt, counsel have the right, in protecting their clients, to raise the point, and call the attention of the court to the matter, and demand that the witness be apprised of his rights, and given an opportunity to make the claim under oath, if he so elect.   We think this would be the proper method of raising the point in these cases.   Of course, the witness might do it without the intervention of counsel.   A refusal of the trial court to properly instruct a witness when thus requested by his counsel might constitute reversible error.   We hold, then, that the claim of privilege, by reason of the incriminating nature of the answer sought, was not made with sufficient definiteness to apprise the court of the nature of the claim; and, further, that the claim cannot be made by counsel, even when the witness is also a party.

But there are reasons why we think this cross-examination improper as affecting the credibility of the witness.   The insinuating style of questioning in which the prosecution indulged should never be permitted for this purpose.   That method of examination does not effect the credibility of the witness, because it neither shows him to be untruthful nor necessarily of bad moral character.   The rule in these cases is somewhat strict, and necessarily so, because it is dangerous ground.   Injustice

may be done if the rule is relaxed. Where a cross-examiner seeks to impair the credibility of a witness by proof of collateral crimes, he should be confined to specific acts. He may ask the witness whether or not he committed the act, or whether he has been convicted thereof or imprisoned therefor. But, manifestly, the interrogatories should be so framed as to permit the witness to admit or deny the act itself. He should not, for impeachment purposes, be asked questions which simply suggest inference. It has repeatedly been held that a party could not be asked whether or not he had been indicted for a particular offense, on the ground that an indictment did not prove guilt. *People* v. *Crapo*, 76 N. Y. 288; *People* v. *Noelke*, 94 N. Y. 144; *People* v. *Irving*, 95 N. Y. 541; *Van Brokkelen* v. *Berdell*, 130 N. Y. 145, 29 N. E. 254. For the purpose of proving the commission of the crime for which a party is being tried, any evdence is proper that raises a legal inference, or makes it probable that the crime was committed by the accused. Not so, however, where it is sought to show a collateral crime to affect credibility. That issue is not on trial, and the jury must not be called upon to investigate it. It was not proper, then, to ask plaintiff in error in this case, when speaking about the alleged crime in connection with the bank, whether or not he was not "accused," etc., and whether or not it was not "claimed" by the bank officers, etc., because all that may have been true, and yet no such crime as claimed have been committed. This applies also to the examination relative to the death of his first wife, and the fact that he had not seen his parents since 1874. See Whart. Cr. Ev. § 432; *Schultz* v. *Railroad Co.*, 89 N. Y. 250; *State* v. *Pushon*, (Mo. Sup.) 34 S. W. 28; *Bates* v. *State*, (Ark.) 30 S. W. 890.

There is yet another objection. The collateral crimes sought to be established were too remote to necessarily show a present bad moral character. They had been committed, if at all, nearly 22 years before the trial. They may have been long since sincerely repented of and atoned for. In Greenleaf on Evidence (section 459) it is said: "The examination being governed and

kept within bounds by the discretion of the judge, all inquiries into transactions of a remote date will, of course, be suppressed; for the interests of justice do not require that the errors of any man's life, long since repented of and forgiven by the community, should be recalled to remembrance, and their memory be perpetuated in judicial documents, at the pleasure of any future litigant. The state has a deep interest in the inducements to reformation held out by the protecting veil which is thus cast over the past offenses of the penitent. But where the inquiry relates to transactions comparatively recent, bearing directly upon the present character and moral principles of the witness, and therefore essential to the due estimation of his testimony by the jury, learned judges have of late been disposed to allow it." And see, also, *Holder* v. *State*, (Ark.) 25 S. W. 279.

Another objection absolutely fatal if this cross-examination was for the purpose of affecting credibility only was the introduction of Exhibit P. Nothing is better settled than that, where a witness is asked as to collateral crimes for this purpose, his answers are absolutely conclusive on the party asking. 3 Rice, Ev. § 222, and cases cited. Nor does it change the rule that the denial comes by the written admission of the witness. The principle is not different from introducing another witness to prove oral admissions. But, as this evidence was all properly admitted for the purpose of showing motive, it is elementary that the judgment cannot be disturbed because it was inadmissible for another purpose, unless the jury were expressly instructed that they might consider the evidence for such improper purpose. We cannot presume that any improper use was made of such evidence. Indeed, the instructions in this case rebut any such presumption, because, while the jury was repeatedly told that such evidence might be considered as bearing upon the question of motive, they were at no time instructed to consider it as bearing upon the question of the credibility of plaintiff in error. The court said in the charge: "The defendant is not being tried for any other crime or offense than that charged in the information, and it

would not be competent evidence, and you could not consider any evidence, of the commission by the defendant of any other crime or offense, except so far as such other crime or offense, if any, tends to establish the crime of which the defendant is charged, and upon which he is being tried, or tends to establish the question of his intent or motive as to the commission of the crime in question, or tends to establish his guilty knowledge of the crime." This was equivalent to a direct instruction not to consider such testimony as affecting the credibility of the accused as a witness. See, on this subject, *Dows* v. *Glaspel*, 4 N. D. 251-267; 60 N. W. 60; *McKenzie* v. *Vandecar*, (Mich) 62 N. W. 1031.

Errors are assigned upon certain remarks made by counsel for the state in arguments to the jury, and to which exceptions were taken at the time. We had occasion in *State* v. *McGahey*, 3 N. D. 293, 55 N. W. 753, to discuss this question at some length, and we will here enter into no general discussion. It is not claimed in this case that there was a violation of any statutory limitations upon counsel. The objections are placed upon broader grounds, and, to support them, it must clearly appear that counsel have stepped beyond the bounds of any fair and reasonable criticism of the evidence, or any fair and reasonable argument based upon any theory of the case that has support in the testimony. This rule was never intended to limit counsel in any manner that could injuriously affect his case upon the merits. He is allowed a wide latitude of speech, and must be protected therein. He has a right to be heard before the jury upon every question of fact in the case, and in such decorous manner as his judgment dictates. It is his duty to use all the convincing power of which he has command, and the weapons of wit and satire and of ridicule are all available to him so long as he keeps within the record. He may draw inferences, reject theories and hypotheses, impugn motives, and question credibility, subject only to the restriction that, in so doing, he must not get clearly outside the record, and attempt to fortify his case by his own assertions of facts, unsupported by the evidence. See *Tucker* v. *Henniker*, 41 N. H. 317;

*Brown* v. *Swineford*, 44 Wis. 282; *Martin* v. *State*, 63 Miss. 505; *Rolfe* v. *Rumford*, 66 Me. 564; *McDonald* v. *People*, 126 Ill. 155, 18 N. E. 817. But this matter is, and of necessity must be, largely within the discretion of the trial court, and the action of the trial court should be reversed only in cases of clear and prejudicial abuse of this discretion. *Bulliner* v. *People*, 95 Ill. 396; *Festner* v. *Railroad Co.*, 17 Neb. 280, 22 N. W. 557; *Hatch* v. *State*, 8 Tex. App. 416.

Let us apply these principles. One of the counsel for the state, Mr. Voss, said, "Kent claimed he had been short in his insurance accounts in the sum of about $300. Kent could have raised this money in half an hour's time in Mandan, if he had desired to do so;" and, again, "Kent, on the morning he went away, had ample funds in his pocket with which to pay the embezzlement;" and, again, "that the defendant had robbed a bank in Ohio, changed his name, and gone to England;" and, again, "that he assumed that every time the defendant changed his name he committed a crime;" and, finally "that one Allison had been subpoenaed by the state, had sat in the court room during the entire trial, and had not been called by the defendant to disprove Swidensky's statement that he received a letter from Allison of Steele." There is evidence upon which the first statement might be fairly based, and there is ample evidence in the record to justify the remark about robbing the bank. The assumption connected with the change of name was simply given to the jury as an assumption, and could not have misled them, and the remark respecting Mr. Allison was expressly taken from the jury in the charge; and when we also consider the fact that, in speaking of the statement of the attorney, the court told the jury to "give it no consideration except so far as it is sustained by the evidence, if at all," and again said to the jury, "You are not to consider any statement made by the attorneys on either side outside of the testimony," and when we consider also the careful manner in which the court throughout the charge guarded the jury against being influenced by anything except the evidence only, we are

clear that there was no abuse of discretion, either in ruling upon the remarks of Mr. Voss, or those of Mr. Nye which followed, and which we will not particularly set forth.

The exceptions to the charge as given and the refusal to charge as requested need only general mention. We have, severally, studied the charge with care. It bears unmistakable evidence that the trial court fully appreciated the gravity of his duties, and the importance of the case both to the state and the accused. It is a fair judicial statement of the law applicable to the case. If it contains any errors, they are certainly not against the accused. The charge is always as favorable to him as the law would permit. We doubt not that counsel, in their intense zeal (and it is highly commendable in a capital case,) honestly urge their exceptions to the charge, and honestly believe that portions of the same were "misleading," and "invaded the province of the jury," were "argumentative," and "assumed that certain facts were proven," and were "prejudicial to the accused;" but all these claims are general in their nature, and raise no specific questions of law for discussion, but simply involve a construction of the language used. We do not look at the language from counsel's point of view. To us it seems vulnerable to none of these objections, and it would be an unwarranted use of space to reproduce the language here. Counsel contend for no principle of law in this connection which may not be conceded. It is true that a court should not sum up one side of the case only, and should not and must not argue the testimony to the jury, and should not assume that certain facts have been proven, and it is also true that a bad instruction is not generally cured by a good one on the same subject; but, as already stated, these principles were not violated by the instructions given.

Thirty-two errors are assigned upon the refusal of the court to give instructions. Their length precludes their reproduction, but they may be disposed of somewhat summarily. The abstract shows that these instructions were refused, but an inspection of the charge shows that the greater portion of them were adopted

by the court as its own, and were given either verbatim, as requested, or in language of identical import. When this is not the case, the subject upon which the instruction is asked is always covered, and correctly covered, by the charge given. This leaves plaintiff in error no ground of complaint upon which to stand. *State* v. *McGahey*, 3 N. D. 293, 55 N. W. 753; *State* v. *La Grange*, (Iowa) 62 N. W. 664; *Davidson* v. *State*, (Ind. Sup.) 34 N. E. 972; *People* v. *Harris*, 136 N. Y. 423, 33 N. E. 65; *Com.* v. *Farrell*, (Mass.) 36 N. E. 475; *Clark* v. *State*, (Tex. Cr. App.) 26 S. W. 68; *Thompson* v. *State*, (Tex. Cr. App.) 26 S. W. 198; *State* v. *Freidrich*, (Wash.) 30 Pac. 328.

In this connection, it will be proper to notice some assignments of error based upon certain language used by the court towards senior counsel for plaintiff in error in the cross-examination of certain witnesses for the state. It is apparent from the record that the learned senior counsel was conducting the cross-examination in a manner which the trial court regarded as unfair to the witness, and incompatible with that decorum that should always attend trials in courts of justice. If such were the case, it was the right and duty of the court to correct it. And, while there is no doubt but that some sharp language was used, yet it is clear that counsel was the aggressor, and we cannot say that the court went further than was necessary to protect the witness and control the examination. Yet, in his charge to the jury, the court, by specific instruction, directed the jury not to permit any passage of words or manifestation of temper between court and counsel to prejudice them in any manner against the accused. We do not say this instruction was necessary, but it cured any possible error. *People* v. *Northey*, 77 Cal. 618, 19 Pac. 866, and 20 Pac. 129; *Com.* v. *Ward*, 157 Mass. 482, 32 N. E. 663; *Ryan* v. *State*, 83 Wis. 486, 53 N. W. 836; *State* v. *Whitworth*, (Mo. Sup.) 29 S. W. 595.

All the points presented by the motion in arrest that require special notice have already been discussed, and decided adversely to plaintiff in error. One ground much relied upon in the motion for a new trial was misconduct of the trial jury. It was desired

by the court, and doubtless by the parties also, that great care should be exercised in keeping all improper influences from the jury. To that end, the jury, as soon as impaneled, was placed in charge of two bailiffs, and all the usual and proper rules in such cases were given. It was claimed, nevertheless, that after the jury was impaneled, and before the case was finally submitted to them (a period of about three weeks,) the jurymen did separate, without leave of court, and under such circumstances and in such situations as rendered it possible for them to be improperly influenced in the performance of their duties as jurors. These matters of separation were brought to the attention of the court by affidavits, at great length, and with great particularity. They consisted for the greater part of brief interviews by individual jurors with their respective wives, not in the immediate presence of their fellow jurors, and not always within hearing of the bailiffs. On one occasion there was another lady with the wife of one juror, and such lady also spoke to such juror. It is not claimed in these affidavits or on argument that any juror was improperly influenced, or that any attempt was made to improperly influence any juror. It was evidently the theory of plaintiff in error that, when once it was shown that an opportunity had been given for improper influence, prejudice would be presumed, and the burden thrown upon the state to overcome such presumption; and such, no doubt, is the law, at least in capital cases, and where such opportunity arises from disobedience to the court's order. See *Moss* v. *Com.*, 107 Pa. St. 267; *Goersen* v. *Com.*, 106 Pa. St. 477; *Keenan* v. *State*, 8 Wis. 132; *Maclin* v. *State*, 44 Ark. 115; *State* v. *Harrison*, 36 W. Va. 729, 15 S. E. 982; *State* v. *Dolling*, 37 Wis. 396. The state seems to have accepted that view also, and filed a large number of counter affidavits, including affidavits of eleven of the twelve jurors, and the persons who were known to have spoken to any juror at any of the alleged interviews, and also of the two bailiffs who had the jury in charge. The members of this court have severally taken the time to carefully consider these affidavits on both sides, and we are all of the opinion

that every point made in the affidavits in support of the motion has been met by the counter affidavits in a manner which leaves no possible ground to believe that any juror was improperly influenced, or any effort made to improperly influence any juror, at any of the alleged separations.

But it is claimed that an improper influence came from another source. By leave of court, and with the full consent of counsel on both sides, the jury was permitted to attend church. Pursuant to such leave, a portion of the jury, in charge of the bailiff, attended the Episcopal Church in Fargo. There is no claim that it was known before hand that any jurors would attend that church, or anything that was said was spoken with the purpose or expectation of influencing the jury in any manner in the discharge of their duties. But it so happened that the minister upon that particular day discoursed upon the familiar subject of doubting Thomas. A large portion of the sermon has been brought upon the record. In it the minister animadverts upon the incredulity of Thomas in refusing to accept the statements of his friends and fellow disciples as to the existence of a risen Lord, and demanding ocular and manual evidence thereof. It is claimed that the whole tenor of the sermon was such as to induce the jurors to accept facts as proven on less positive and convincing evidence than they otherwise would have done. Granting this, it is difficult to perceive why the jurors' doubts would not be resolved just as readily in favor of the testimony of the defense as of the prosecution. But the whole theory is wrong. It is speculative and almost chimerical. The preacher was speaking of spiritual matters, and his whole application was spiritual. No reasonable man would be influenced in the performance of his duties as a juror in the slightest degree by what was said. Were it otherwise, we do not see how error could be assigned in this connection. Counsel for the accused, in open court, consented that the jurors might attend church. He knew they must hear something, and his consent carried with it an assent that they should hear anything that was a proper and ordinary enunciation from a Christian pulpit. They heard nothing more.

There remains but a single further point for consideration. It was urged upon the motion for a new trial, and is urged here, that the verdict has not sufficient support in the evidence. The members of this court, knowing full well the grave results that hang upon their words, unhesitatingly declare that they have no doubt whatever upon that point. No unprejudiced person could read this record and entertain a doubt. A murder has been committed, cold, cruel, causeless, and with a deliberation of preparation, and an inexorable determination of execution, that stands almost unparalleled. An innocent woman, in the prime of life, whose misfortune it was that she had been sinned against, in her own home, at the dead of night, was killed by an assassin. Did the accused hire that assassin to commit the deed? He has been twice tried, and it has been his good fortune to be defended at all points by able and faithful attorneys. The senior counsel has clung to the fortunes of his client with an intelligent, tenacious, unselfish zeal that honors the profession to which he belongs. The first trial was held in the county where the crime was committed. An impartial jury declared the accused guilty. That verdict this court reversed, by reason of an error of law occurring at the trial. In due time another trial was had, and at a distance of 200 miles from the scene of the tragedy,—far removed from all influence of prejudice or malice. Another jury was selected, with unusual care. The case was tried by the court with absolute fairness, and again the jury declared that the accused was guilty, and that he should suffer death. If the story as detailed in evidence by the assassin, Swidensky, can be believed, no more righteous verdict was ever pronounced. This story was straight-forward, probable, and consistent in all its parts, and bore much inherent evidence of its own truthfulness. By it, the accused was declared to be the party who originated the crime, and planned every ghastly detail of its execution, and promised the assassin $18,000 for its performance. All the ability and skill of counsel, aided by the powerful leverage of the self-confessed depravity of the witness, were unable to weaken this story on cross-examina-

tion.   Nor could the ingenuity of counsel weave into the case any possible motive on the part of Swidensky for the murder of Mrs. Kent, unless his story was true.   It will serve no purpose to set out the corroborative testimony tending to connect the plaintiff in error with this crime.   His own words and conduct condemn him.

A lawyer, a respectable citizen, possessed of property which he valued at several thousand dollars, with a wife and son, for whom, in his testimony and in certain letters in the record, he professes the most ardent attachment.   He left his home on the morning of the day preceding the homicicide, to return that evening. But the next day he was with his old friend, Mr. Seavey, at West Superior, Wis.,—one who had known him only as Myron R. Kent. He told Mr. Seavey that he was on his way to England, to get a large sum of money from his mother.   His old mother was in Ohio, and had lived there certainly since 1873.   He had no money in England, and no expectation of any.   On April 9, 1894, we find him at Trenton, Neb., writing to Mr. Seavey, using another alias, and asking for the loan of a small amount of money, still claiming that he was going to England.   It was now nearly a month since he had so unceremoniously left that wife and child.   He had received no word concerning them, nor does it appear that he had made any effort to let them hear from him. Did he send them the message of a husband and father through their old friend Mr. Seavey?   By no means.   But he wrote: "Let no living soul know where I am.   I know I can trust my life in your hands."   Mr. Seavy wired him:  "Do you know your wife has been murdered?"   He replied: "No. Comply with the request of my letter."   At Trenton the officers located him, and had him arrested, ostensibly for larceny.   While awaiting requisition papers, he escaped from the officers, and became a tramp across the plains of Nebraska and Colorado, stopping at a ranch in Colorado, where he worked for some time; but, learning that the Lairds (his deceased wife's brothers) knew of his locality, he immediately left, and again became a tramp, and is next heard of

as a section hand at Arlington, Colo., where he was arrested. How it could ever be supposed that an intelligent jury would believe that a man of his financial and social standing would desert a loved wife and child, drop to the level of a fugitive felon, hiding and fleeing from place to place, and later pass unheeded the terrible news of the murder of his wife, and permit his valuable property, unwatched and uncared for, to be dissipated and lost, all because he was short a few hundred dollars with some insurance companies, passes comprehension. The verdict has ample support. The whole record presents no error.

The law demands that this judgment be affirmed. It is so ordered. All concur.